TRINA A. HIGGINS, United States Attorney (#7349)
BRYANT WATSON, Assistant United States Attorney (#16980)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 232-5763
Email: bryant.watson@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

---

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>**Cellphone with assigned phone number (760) 867-8242** | Case No. 2:25cr75-DAO<br><br>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR CELL PHONE AND SEIZURE OF BIOMETRIC DATA |

I, Sarah Klein, being first duly sworn, hereby depose and state as follows:

## AFFIANT AUTHORITY AND KNOWLEDGE

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Pursuant to 18 U.S.C. § 3051, I am empowered to enforce criminal laws of the United States. As a federal agent, I am authorized to investigate violations of laws of the United States and execute search warrants issued under the authority of the United States.

1

2.      As a result of my training and experience as an ATF SA, I am familiar with federal laws, particularly those relating to firearms related offenses, including 18 U.S.C. § 922(o), which provides, "Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922 (o).1  The offense under investigation is 18 U.S.C. § 922(o).

3.      In preparing this affidavit, I have consulted with other agents and law enforcement officers who are experienced in machinegun investigations and the following opinions are shared by them.

## IDENTIFICATION OF THE DEVICE TO BE SEARCHED

4.      The property to be searched is a cell phone with the assigned telephone number (760) 867-8242, hereafter referred to as the **Target Cell Phone**, as described in Attachment A.

5.      The **Target Cell Phone** is in the custody of the United States and was previously seized pursuant to a search warrant issued in Case No. 2:25-MJ23-DAO. By way of background, on January 16, 2025, agents arrested MATAELE pursuant to a federal arrest warrant issued in Case No. 2:24-cr-00358-DAK-2. In a post-*Miranda* interview, MATAELE admitted to possessing and transferring a Glock switch and fully automatic AK-style rifle. Later, agents attempted to download the contents of the **Target Cell Phone**, but were unable to do so due to security features activated on the **Target**

---

1 Paragraph 2 of Section 922(o) provides, "This subsection does not apply with respect to--
(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect."18 U.S.C. § 922(o)(2).

2

**Cell Phone** that require "Face ID" in order to bypass.  Agents are seeking to obtain biographic information ("Face ID") from MATAELE during his transport to his initial appearance in order to search the **Target Cell Phone**.

6.      The applied-for warrant would authorize the forensic examination of the device for the purpose of identifying electronically stored data particularly described in Attachment B, as well as the seizure of MATAELE's biometric data to unlock the **Target Cell Phone**.

**FACTS ESTABLISHING PROBABLE CAUSE FOR THE SEARCH OF THE TARGET CELL PHONE AND SEIZURE OF BIOMETRIC DATA**

7.      As explained below, I believe the property described above is evidence of the crimes of the possession and/or transfer of a machinegun in violation of 18 U.S.C. § 922 (o) (the "Target Offense").

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I have not included every fact known concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of the unlawful transfer and/or possession of a machinegun, specifically but not limited to violation of 18 U.S.C. § 922 (o), are being stored in the item further described in Attachment A**.**

9.      There is probable cause to believe that MATAELE is utilizing the **Target Cell Phone** to facilitate the illegal transfer of machineguns to Puifatu Moors ("MOORS"), another individual under indictment related to this investigation.

3

a.   On or about November 6, 2024, agents arrested MOORS pursuant to a federal arrest warrant concerning Title 18 § 922(o).  After MOORS' arrest, ATF conducted a post-*Miranda* interview with MOORS, in which MOORS admitted to purchasing two machineguns, specifically a Glock switch and a fully automatic AK-style rifle, from an individual known to him as "Lucky."

b.   MOORS stated that he met MATAELE in Lehi, Utah on two separate occasions when he purchased the Glock switch and fully automatic AK-style rifle.

c.   MOORS admitted that he later sold the Glock switch and fully automatic AK-style rifle. MOORS stated that he profited approximately $150 from selling the Glock switch and approximately $3,000 from selling the fully automatic AK-style rifle and an additional semi-automatic AK-style rifle.

d.   MOORS stated that he fired approximately 200-300 rounds through the fully automatic AK-style rifle before he sold it.

10.    Digital evidence, i.e., text messages on MOORS' cellphone, corroborated MOORS' account that an individual known as "Lucky" used the **Target Cell Phone** to facilitate the unlawful transfer of machineguns, specifically:

a.   On November 6, 2024, ATF received a federal search warrant for MOORS' cellphone. In the post-*Miranda* interview with MOORS, MOORS identified communications between himself and "Lucky" and

confirmed that he contacted "Lucky" via **(760) 867-8242,** i.e., the **Target Cell Phone**.

b.  Agents later obtained from MOORS' cellphone, then reviewed several series of communications between MOORS and the **Target Cell Phone**, which is saved as "Lucky."

c.  On October 1, 2024, MATAELE used the **Target Cell Phone** to text MOORS that sale price for a Glock Switch was $400 and the price of a fully automatic AK-style rifle was $2500, as reproduced below.

*MATAELE:[2] "Glock switch $400"*
*MATAELE: "Works on your pistol I sold you"*
*MATAELE:*



*MOORS: "Yooo 😂😂 I sold my switch"*
*MOORS: "I had a full carbon fiber switch that's clean!!"*
*MOORS: "Is the G17 BOS in your name?"*
*MATAELE: "Yeah i got it from sportsmans a few years back on my name"*
*MOORS: "Nice I get my switches for $80 tho"*

---

2 In the reproduction of text messages in this affidavit, MATAELE is listed as the sender of the messages based on all known information submitted herein. However, in MOORS' cellphone, the Target Cell Phone is listed simply as "Lucky" with the same target cell phone number, (760) 867-8242.

*MOORS: "Where'd you get yours ? Or is it a 😅 type of situation"*
*MOORS:*



*MOORS: "From Gen 1 - gen 5"*
*MOORS: "Fits all"*
*MATAELE: "Damn can I buy some from you lol 😂"*
*MATAELE: "I'm paying $250"*
*MATAELE: "Can I buy the ae switch from you too"*
*MATAELE: "Ar"*
*MATAELE: "I'm selling an Ak mini that's full auto $2500 ghost"*
*MATAELE: "Hard to find full auto AKs"*
*MATAELE:*



    d.   After the above text messages, MATAELE used the **Target Cell Phone to** text MOORS a video of an individual firing a fully automatic AK-style rifle that resembled the firearm pictured above. MATAELE also indicated that he builds machineguns from parts kits.  A screenshot captured from the video, as well as those text communications, are reproduced below.



*MATAELE: "I got from my cousin neighbor 😂"*
*MATAELE: "The AK I built it myself from parts kit"*
*MATAELE: "I build ghost Glocks ghost ar and ghost aks"*
*MOORS: "Yeah bro I had like 480 g switch's I sold each for 500 😂"*
*MOORS: "All imported but my guy I get it from got taken down I'm looking for someone new"*
*MATAELE: "I believe you!"*
*MOORS: "There's alot of rednecks I sold most of them to the others were blacks & miko"*
*MOORS: "What type of AK is that"*
*MATAELE: "Romanian pm90 shorty 12 inch barrel"3*

---

3 It should be noted that agents recovered a fully automatic AK-style rifle from MOORS with a rifled barrel of approximately 12-1/4 inches in length.

e. On October 8, 2024, MATAELE and MOORS confirmed via from the **Target Cell Phone** text the sale of the Glock switch and arranged to meet the following day. In addition, MATAELE sent MOORS a video of MATAELE firing a fully automatic firearm. A screenshot captured from the video, as well as those text communications, are reproduced below.

*MOORS: "On the way brother"*
*MOORS: "Just left the atm"*
*MOORS: "Can we meet in lehi"*
*MATAELE: "For just the switch?"*
*MOORS: "For just the switch?"*
*MOORS: "Yeah fam, I still haven't got the ok from my boss aka my wife to get another AK 😆"*
*MATAELE: "Ok"*
*MATAELE: "Can meet here"*
*MATAELE:*



*MATAELE: "Oh crap can we meet tomorrow same place and time? My son borrowed my truck for work and didn't say anything"*
*MATAELE: "Just found out when I walked outside"*
*MOORS: "Your good bro I got you tmrw then !"*
*MATAELE: "Just so you know it works! 😆"*

f. After the above text messages, MATAELE texted, via the **Target Cell Phone,** MOORS a video of himself firing a fully automatic firearm with

8

what appears to be an attached Glock switch. Below is a screenshot

captured from the video sent from MATAELE to MOORS.[4]



    g.   On October 9, 2024, MATAELE and MOORS agreed via text to meet at a

Chevron in Lehi, Utah to conduct the transaction of the Glock switch.

Those text communications are reproduced below.

*MATAELE: "We can meet Golden Corral in Lehi around 6-7"*
*MOORS: "No problem the earlier the better. I know you got your own things going on so let me know when your ready"*
*MATAELE: "My bad Chuck-A-Rama in Lehi"*
*MATAELE: "I can be there in 25 mins"*
*MATAELE: "Let me know if that works"*
*MOORS: "That's perfect ! I'm 30 mins away leaving here in a bit"*
*MATAELE: "Yup"*
*MATAELE: "See you there"*
*MATAELE: "Grey Silverado"*
*MATAELE: "Let's meet at that chevron next to Chuckarama"*
*MOORS: "No problem I'm on the way to the nearest bank now"*

---

4 The video is concurrently submitted as Exhibit 2.

MATAELE: "Can you do $400? Sorry man I really need the money for my granddaughter 1st birthday"

MATAELE: "I'm gonna order more next month I'll grab you one for $80 at cost"

MATAELE: "If my guy doesn't get locked up hahahaha"

MATAELE: "I'll throw in a 30 round Glock mag"

MATAELE: "Perfect for the switch lol 😂"

MOORS: "You got anything else work throwing in the deal this the first and last time I buy a switch for more then 100"

MOORS: "🥴"

MATAELE: "Lol"

MATAELE: "I'll this a box of ammo 9"

MOORS: "If you can do 100rds 9mm target ammo or 3 boxes self defense we still on fam"

MOORS: "Don't worry I understand your in a pinch I just need to make sure it's worth it on my end brother"

MATAELE: "Ok switch for $350 😂"

MATAELE: "The Glock mag is $49 lol 😂"

MATAELE: "On my way"

MOORS: "Okay. Still at the bank I'm 30 mins away"

MATAELE: "Ok 👍"

MATAELE: "I'm parked at the chevron gas"

MOORS: "9 mins away"

MATAELE: "Yup"

MOORS: "What car u in"

MATAELE: "Silverado truck grey"

MOORS: "I'm here at the chuck a Rama/chevron"

       h. On October 9, 2024, the same day MATAELE and MOORS agreed to meet to conduct the transaction of the Glock switch, ATF utilized an ATF Confidential Informant (CI-1)[5] to conduct a controlled purchase of a Glock switch from MOORS. Agents believe MOORS resold the same Glock switch that he purchased from MATAELE.

---

[5] ATF CI-1 is working for agents for financial considerations. Although CI-1 is a convicted felon, the undersigned and ATF has found CI-1 to be trustworthy as confidential informant. Among other reasons for assessing C1-1 trustworthy, CI-1 has provided information that agents have verified and has led to numerous federal arrests and convictions. CI-1 is knowledgeable about the illicit sale of firearms and machineguns.

i. On October 11, 2024, MATAELE used the **Target Cell Phone** to text MOORS about the price and sale of a fully automatic AK-style rifle and a semi-automatic AK-style rifle. MATAELE agreed to sell the aforementioned firearms to MOORS for $3,200. MATAELE also indicated that he only had one fully automatic AK-style rifle left. Those text communications are reproduced below.

*MOORS: "I might take those auto AKs off you"*
*MOORS: "How many you got"*
*MATAELE: "Ok"*
*MOORS: "Let me know how many you got for me"*
*MATAELE: "I only have 1 full auto"*
*MATAELE: $3k comes with 10 - 40 round mags and 300 rounds of ammo"*
*MATAELE:*



    j.   In addition to the above photos, MATAELE sent MOORS a video of an individual firing a fully automatic AK-style rifle that resembled the firearm pictured above. The two also discuss the sale of machinegun. A screenshot captured from the video, as well as those text communications, are reproduced below.



*MATAELE: "Romanian PM90 12 inch barrel Draco size"*
*MOORS: "I have have another guy with a full auto Kalashnikov 7.62 for $2,300 if you can match that. I go with you no ammo or accessories needed just 1 mag will be okay"*
*MATAELE: "Here is to verify it's full auto has 3rd pin"*
*MATAELE:*



*MATAELE: "Full auto selector"*

*MOORS: "I have have another guy with a full auto Kalashnikov 7.62 for $2,300 if you can match that. I go with you no ammo or accessories needed just 1 mag will be okay"*

*MOORS: "If you can match that price I'll buy your auto AK for ($2,300) and your PSA AK for ($700)"*

*MOORS: "3K in total"*

*MATAELE: "Let me think about it cause I have another buyer willing to pay $3k for it"*

*MOORS: "Alright. That's more money for you so no worries!"*

*MATAELE: "How about $3200 for both rifles"*

*MOORS: "I'll do that if you can include the ammo and accessories. If so we got a Deal"*

*MATAELE: "I'll throw in the mags no ammo deal! 😂"*

*MOORS: "How many mags?"*

*MATAELE: "10 40 round and 1 30 round"*

*MOORS: "I'll let you know"*

*MATAELE: "I bet you the other Ak is not a shorty!"*

*MATAELE: "And not an import like mines"*

*MATAELE: "No serial number"*

*MOORS: "Looks like you're right it's not a Shorty 🍬. It is an import though and it do have serial numbers."*

*MOORS: "I have to think on it I'll let you know"*

*MOORS: "Looks like you're right it's not a Shorty . It is an import though and it do have serial numbers."*

*MATAELE: "For $200 more you get a shorty and no serial number with 11 mags 🍖"*

*MATAELE: "It's a no brainer lol 😂"*

*MOORS: "I feel you it's just because he's offering 1,000 rds Tula Ammo & 3 Romanian mags but let me talk with my wife I'll let you know what I decide."*

*MATAELE: "You still want the ak101 for $700?"*

*MATAELE: "If you decided to get the other Ak?"*

*MOORS: "I'll take your deal. Since I bought from you already $3200 it is 🤝"*

*MATAELE: " 🤝"*

*MOORS: "Next week I'll have your money"*

*MOORS: "Monday or Tuesday. You okay with that?"*

k.  On October 14, 2024, MATAELE and MOORS discussed MOORS

sending MATAELE money for the firearms and machineguns through

13

Venmo. MATAELE and MOORS later discussed meeting at a location to conduct the transaction.[6]

*MOORS: "I'm in bringham city/mantua for work almost 3 hrs away from you. We are staying down here for 3 weeks at a holiday inn today is the only day I'm able to make this deal work We're going to have to meet in Sandy. It is 1 hour 57 minutes away from me. It's a loss for me since I have to leave work 2-3 hrs early but I'll be there around 6pm 6:15 if there's traffic."*
*MATAELE: "Yup I'll be there 🤜"*
*MATAELE: "Anyway you can do some or all via Zelle or Venmo?"*
*MOORS: "Yes, sir how much would you want on Venmo?"*
*MATAELE: "Heck you can do all of it via Venmo lol"*
*MOORS: "OK, I'll probably do it all on Venmo so I can save me time so I don't have to stop by the bank"*
*MATAELE: "Yup save us both the headache"*
*MATAELE: "Thanks bro"*
*MATAELE: "Hey bring a case"*
*MOORS: "I'm on the way my ETA is 6:39"*
*MATAELE: "Hey bro can we meet here?"*



*MOORS: "I'll do it for $20 bucks less 😂. It's because im meeting my wife in Holladay to switch cars cuz her Lexus doesn't have enough room i'd have to put the seats down and that's too much work alr"*
*MOORS: "Let me know if your still willing to meet there"*
*MATAELE: "60 rounds or precious ammo? Deal?"*
*MATAELE: "I'll make it a 100 rounds"*
*MATAELE: "No use having a gun with no bullets 😂"*
*MOORS: "Okay 100rds is worth changing the plan"*
*MOORS: "Deal"*

---

[6] On October 16, 2024, ATF utilized CI-1 to conduct a controlled purchase of a fully automatic AK-style rifle and a semi-automatic AK-style rifle from MOORS for $4,500.

MATAELE: "Especially shooting full auto bullets fly! 😂"
MOORS: "Your rightttt!!"
MATAELE: "Gone in 10 seconds full mag gone lol 😂'
MATAELE: "Or 5 seconds lol"
MOORS: "8 mins away"
MATAELE: "Yup I'm here"
MATAELE: "Let me know when your outside I'll come out"
MATAELE: "Same truck grey Silverado"
MATAELE: "Let me know when you're here I'll come out"
MOORS: "Here"

11.     Agents learned that **Target Cell Phone** is tied to MATAELE in a few

ways:

a.  A query within the LexisNexis carrier lookup tool identified MATAELE

as the associated name of the **Target Cell Phone.**

b.  According to state databases, MATAELE listed the **Target Cell Phone** as

his phone number for his Utah State Driver's License.

c.  On October 8, 2024, the **Target Cell Phone** sent MOORS a

videorecording of an individual firing a machinegun, and that individual

appearance matches the appearance of MATAELE as he appears on his Utah

State Driver's License, as depicted below.

15





      d.  Agents believe the **Target Cell Phone was** located in the District of Utah because MATAELE used the **Target Cell Phone** to arrange the sale of machineguns, then met with MOORS shortly afterwards.

## **TECHNICAL TERMS**

      12.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   "Cell Phone" (or Wireless telephone):  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## AFFIANT'S EXPERIENCE AND KNOWLEDGE OF HOW CELL PHONES CAN CONTAIN EVIDENCE OF CRIMINAL CONDUCT

13.   The affiant is knowledgeable about the technological aspects of cells phones, how cell phones are typically used to unlawfully possess and transfer of machine

17

guns, and the evidence typically stored on cell phones during such unlawful conduct, as explained below:

a.      Cell phones can contain (1) relationship information; (2) location information; (3) identity information; and (4) criminal activity information. Relationship information establishes connections between the owner/user of the phone and others who may be involved in criminal activity, such as emails, texts, call logs, contact lists, photos, videos, social networking apps, and chat apps. Location information can include map searches, requests for directions, location information embedded in photos, and even what location is labeled "Home." Identity information ties a phone possessed by a person to otherwise anonymous accounts/information through records of access to email accounts, contacts and call logs, the aliases and nicknames used, and even biometrics. As far criminal activity information, cell phones can be used to memorialize a crime through photos or videos of the crime or photos or videos of persons celebrating the commission of the crime.

b.      Cell phones can be used to arrange transactions through text messaging and phone calls.  Cellular phones can be used to record the contact information of buyers, suppliers, and associates of the organization, as well as record a list of recent calls. Persons involved in the transfer and/or possession of machineguns often use cellular telephones to take photographs or video record their criminal activity or possession of items illegally obtained.  Cellular phones can be used to record, store, and/or transmit these photographs or videos and to document transactions or sales of firearms.

18

c.    I know, from training and experience with firearms investigations, that persons involved in the transfer and/or possession of machineguns often utilize cellular phones to further their illegal activity.

d.    Based on training and experience, I know that illegal machinegun distributors commonly communicate via telephone using real-time calls, voicemails, and audio messages. I know that conducting the transfer and/or possession of machineguns requires a significant amount of coordination, much of which is likely done via telephone.

e.    Based on my training and experience, persons involved in the illegal transfer of machineguns often utilize the same cellphone for illegal conduct including the acquisition and sale of machineguns.

f.    Based on my training and experience, individuals involved in the possession and transfer of machineguns often utilize cellular telephones to communicate with each other and to arrange meetings with the buyers and suppliers of the firearms, leaving behind a trail of digital evidence of their criminal conduct.  Such digital evidence stored on cellular phones and or SIM cards, include text messages, emails, photographs, videos, phone logs, and address books or contacts list, indicate who a person is communicating with and what type of activity they are involved in.

## THERE IS PROBABLE CAUSE BASED ON THE FACTS AND THE AFFIANT'S TRAINING, EXPERIENCE

14.    Based on my training, experience, and knowledge of this investigation, I believe the following:

19

a.      MATAELE uses the **Target Cell Phone** to communicate with MOORS to arrange meetings to supply MOORS with machineguns.

b.      MATAELE uses the **Target Cell Phone** to record his possession and firing of machineguns.

c.      MATAELE leaves behind a trail of digital evidence when communicating with others and to arrange meetings with the buyers and suppliers of the machineguns, as well as when recording his possession and firing of machineguns.  Such digital evidence stored on **Target Cell Phone** and/or its SIM cards, include text messages, emails, photographs, videos, phone logs, and address books or contacts list.

d.      There is probable cause to believe that the **Target Cell Phone** described in Attachment A, contains evidence showing MATAELE violated 18 U.S.C. § 922(o), as well as evidence that others conspired to and violated 18 U.S.C. § 922(o).

## **TECHNOLOGICAL ASPECTS OF THE REQUESTED WARRANT**

15.    **Power Source.** Stored digital information on the cellular phone listed may not be capable of being presently viewed due to the length of time since the electronics were last charged.  A power source may be required to view the digital information.  It may therefore be necessary that the cellular telephone listed be charged before a search can be performed.  If the electronic device needs to be charged prior to being searched, the appropriate charger and/or batteries will be obtained.  Once the electronic device is charged, a search will be performed by a law enforcement officer in order to seize the information listed in this Affidavit for Search Warrant.  If the cellular telephones are

20

locked however, or there is a large quantity of data stored on the cellular phones, ATF Salt Lake City may request the assistance from a computer forensic laboratory to assist agents in the execution of this warrant.

16.    **Nature of Examination.**  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17.    **Biometric Authorization.** The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics, such as fingerprint, thumbprint, or facial characteristics, in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

21

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about

22

securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock

the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **CONCLUSION**

18.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the **Target Cell Phone**, the internal SIM card, and/or Micro SD card as further described in Attachment A have been used to facilitate the transfer and/or possession of machineguns, in violation of Title 18, United States Code, Section 922(o).

19.     I, therefore, respectfully request that the attached warrant be issued authorizing the search of the item listed in Attachment A and the seizure of the item and biometric data listed in Attachment B.

DATED this 28th day of January 2025.

_/s/_____
Sarah Klein, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives.

Sworn and subscribed before me this 28th day of January 2025.

_Daphne A. Oberg_____
THE HONORABLE DAPHNE A. OBERG
United States Magistrate Judge

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The items to be searched are listed as follows:

1. **Target Cell Phone: assigned phone number (760) 867-8242.**

**ATTACHMENT B**

LIST OF ITEMS TO BE SEIZED

1. It is requested that all records on the **Target Cell Phone** in Attachment A that relate to violations of 18 U.S.C. § 922(o) and involve MATAELE since October 1, 2024, be seized, including:

   A.  The specific telephone number assigned to the cellular telephone and/or SIM card.
   B.  The specific ESN, MEID, IMSI, or other identifying number assigned to the cellular telephone or SIM card.
   C.  Any and all digital evidence, fruits, or instrumentalities relating to the transfer and/or possession of a machinegun, stored on the cellular telephone, SIM card, or Micro SD cards including but not limited to voice mail messages, text messages, audio messages, lists of incoming and outgoing calls, phone history, phone directories, address books and contact information, photographs, videos, digital images, and telephone applications ("apps") that allow texting and/or other communications between devices such as cellular telephones.

2. During the execution of the search of the Property described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.